J-A13041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.E.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 54 WDA 2024 |

Appeal from the Order Entered December 7, 2023
In the Court of Common Pleas of Allegheny County
Orphans Court at CP-02-AP-0000074-2023

BEFORE:  OLSON, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: MAY 21, 2024**

T.G. (Mother) appeals from the order involuntarily terminating her parental rights to her daughter, A.E.C. (Child), who was born in August 2021.[1] We affirm.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Mother "was already involved" with the Allegheny County Office of Children, Youth & Families (CYF) when CYF "got a report … that [M]other had [given birth to Child] and was at [the h]ospital."  N.T., 10/20/23, at 43.  The orphans' court explained:

> Mother has a lengthy and significant history of involvement with the juvenile court system.  She has a total of seven children with her parental rights being involuntarily terminated to five of those children.  Historically, Mother has engaged in numerous unhealthy and unsafe relationships and has pervasive mental health

---

[1] The orphans' court also terminated the parental rights of Child's father, J.C., also known as J.P. (Father).  N.T., 10/20/23, at 42-43.  Father has not appealed.

concerns which have negatively impacted her ability to reunify with her children.

Orphans' Court Opinion (OCO), 2/5/24, at 2 (citation omitted).

CYF obtained an order for emergency custody within days of Child's birth. Child was placed "from the hospital" with M.M. and S.M. (Foster Parents). N.T., 10/20/23, at 51.

Child was adjudicated dependent on November 12, 2021. The court found aggravated circumstances due to the termination of Mother's parental rights to her other children, but it directed CYF to continue reunification efforts. *See* 42 Pa.C.S. § 6302 (defining aggravated circumstances). The court also ordered Mother "to continue mental health therapy and attend visitation" with Child. OCO at 3.

CYF had been "aware of [Mother and her] family since 2003[,] due to concerns with domestic violence between [M]other and multiple partners." Petition for Involuntary Termination (Petition), 4/3/23, at ¶ 9. The parties stipulated that since 2015:

> The dates of [Mother's] Family Plans are November 24, 2015, February 28, 2017, April 25, 2017, July 20, 2017, August 18, 2017, December 4, 2017, March 7, 2018, May 29, 2018, October 19, 2018, January 8, 2020, April 19, 2020, July 19, 2020, September 23, 2020, October 19, 2020, January 19, 2021, April 19, 2021, October 19, 2021, January 19, 2022, April 19, 2022, July 26, 2022, January 20, 2023, and July 20, 2023.

N.T., 10/20/23, at 4-5 (Joint Exhibit A).

By 2023, Mother "was compliant[, *i.e.*, fully participating, in] services." *Id.* at 53. Nonetheless, on April 3, 2023, CYF petitioned to terminate Mother's

parental rights due to Mother's "failure to successfully complete her Family Plan and court-ordered goals." Petition at ¶ 11.

The orphans' court held a termination hearing on October 20, 2023. CYF presented two witnesses: licensed psychologist, Dr. Beth Bliss; and CYF caseworker, Stacy Policicchio. Mother presented three witnesses: therapist, Kayla Burris; therapist, Amanda Buchheit; and "family support partner," Hillary Repasi. N.T., 10/20/23, at 81. Mother also testified.

At the close of evidence, counsel for CYF advocated for termination because "unfortunately, this is a case of lack of progress. The issue here is [Mother] has not made adequate progress." *Id.* at 108. CYF's counsel opined that Child "has been in care for two years, and she deserves permanency." *Id.* at 109. Child's counsel likewise opined that Child's "legal and best interest … would be best served through adoption." *Id.* at 112.

Conversely, Mother's counsel argued that Mother's rights should not be terminated because Mother "has been compliant with all of her services." *Id.* at 110 (noting that "two of [Mother's] therapists … both said that they are observing progress"). Mother's counsel also asserted that termination would not meet Child's needs and welfare. *Id.* at 111 (stating that Mother and Child have "a secured attachment," and Mother "meets [Child's] physical and emotional needs by attending to [Child] at [Mother's] visits").

The orphans' court stated it would take the matter under advisement. *Id.* at 113. Shortly thereafter, the court entered the order terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and

(b). Order, 10/20/23.[2] Mother timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).

ISSUES

Mother presents two issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §[]2511(a), (2), (5), and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [C]hild pursuant to 23 Pa.C.S. §[]2511(b)?

Mother's Brief at 6.

LEGAL ANALYSIS

*A. Standard of Review*

In considering Mother's issues, we recognize that CYF, as the petitioner, must prove by clear and convincing evidence that its asserted grounds for termination are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). The orphans' court is free to believe all, part, or none of the evidence, makes all credibility determinations, and resolves conflicts in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). If the evidence supports the orphans' court's findings, this Court will affirm the decision, even if the record could support an opposite result. ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003). We have explained:

---

[2] The order was not entered on the docket until December 7, 2023.

Where the [orphans'] court's factual findings are supported by the evidence, an appellate court may not disturb the [orphans'] court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted).

*B. Statutory Authority*

Termination of parental rights is governed by Section 2511 of the Adoption Act, which provides for a bifurcated analysis. First, the orphans' court must focus on the parent's conduct and "the eleven enumerated grounds" for termination set forth in 23 Pa.C.S. § 2511(a). *Id.* at 830. If the orphans' court finds grounds for termination under Section 2511(a), it must then assess the evidence of the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court "need only agree with [the] decision as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

1.    *Section 2511(a) Grounds for Termination*

Instantly, we examine the orphans' court's termination of Mother's parental rights under subsection 2511(a)(2), which provides for termination when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for h[er] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).    The petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).    Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*

Mother argues that CYF presented insufficient evidence of her continued incapacity to parent.    Mother's Brief at 22.    According to Mother, the orphans' court abused its discretion because "Mother has remedied the conditions that led to removal of [Child,] as a result of [Mother's] participation in [her] treatment programs." *Id.* at 23.    Mother states she "is in a better place" and is "able to provide essential parental care to" Child. *Id.* at 25.    Our review reveals ample support for the orphans' court findings to the contrary.

Dr. Beth Bliss testified as an expert in forensic psychology. N.T., 10/20/23, at 9. She evaluated Mother and Child, and prepared reports on July 28, 2022, March 9, 2023, and September 13, 2023. *Id.* at 9-10, 40 (orphans' court admitting the reports collectively as Exhibit 3). Dr. Bliss diagnosed Mother "with unspecified personality disorder with borderline traits, complex post-traumatic stress disorder, bipolar 2 disorder and alcohol use disorder, moderate, reportedly in full sustained remission." *Id.* at 14. Dr. Bliss expressed concern with,

> most problematically, [Mother's] involvement with individuals. She has this pattern of jumping into relationships very quickly when she knows very little about the person, despite historically finding that to be a problem and causing abusive relationships. She has put her children and herself into very dangerous situations, and she does not seem to be capable of breaking that pattern or getting rid of aggressive or dangerous or unhealthy people for her and her children.

*Id.* at 17-18.

Dr. Bliss testified that despite Mother's participation in services, she "unfortunately" saw little improvement. *Id.* at 18-20. Dr. Bliss explained:

> In some ways … [Mother] was able to state red flags, things she had been learning in treatment, how she's started to tie it to her childhood and recognized that's why she's gotten into these relationships. So, she presented as though she was really gaining from therapy and knew everything, yet she was continuing to still put herself in the same positions and be deceitful with information that impacted the safety of [C]hild.

*Id.* at 20.

Dr. Bliss described instances when Mother provided conflicting information and caused Dr. Bliss "concern about her truthfulness." *Id.* at 22. For example, Dr. Bliss testified:

[Mother] indicated to me that she had no idea where [Child's father] was and had no contact with him at all. And then[,] prior to m[y] being able to write the report, during a surprise house visit with CYF, he was found in her house without pants on, and she claims she didn't know he was there, and he claimed he was picking up clothes and didn't know he was not allowed to do so.

So, there's constantly been this concern about her truthfulness, and although that could be a concern just in and of itself, what's most concerning is her truthfulness about information that would affect the safety of her and [C]hild.

*Id.* at 21-22.

Dr. Bliss stated that Mother "seemingly has completed every service asked of her by CYF or the [c]ourt or me in evaluations." *Id.* at 27. However, Dr. Bliss recommended termination of Mother's parental rights. *Id.* She explained:

[D]espite having seemingly done all of those services for years, [Mother] hasn't made adequate progress on the concerns. She's really made [ess]entially no progress on those concerns.

And … she's not in a place where she can currently meet the needs and welfare of [Child]. She cannot keep [Child] safe if she were the primary caregiver, and [Child] has been in care for almost two years[,] ever since her birth[,] and has a positive and secure attachment to [F]oster [P]arents.

*Id.*

Dr. Bliss repeated her concern regarding Mother's

continued ongoing pattern of getting into abusive, unhealthy relationships and not being able to stop herself from continuing to allow abusive or unhealthy people in her life, despite knowing for

- 8 -

years now that's been the primary factor of why she can't have her child and why she lost her other children [from] a different relationship, [and] a different circumstance, but very similar in a lot of ways.

*Id.* at 23.

When questioned by Child's counsel, Dr. Bliss reiterated that "despite years of receiving th[]e correct services, all of the best services, there's still not progress … or at least not enough progress, especially in the primary areas of concern." *Id.* at 38-39. Dr. Bliss continued:

[Mother] is saying she is willing to do whatever she has to do for [Child], yet was still found to be with this unhealthy, unsafe man, despite knowing that was the primary concern for not having her daughter. [N]ow is probably [Mother's] most motivated time. She wants her daughter back. She said she'd do anything to get her daughter back, she's been to all of the top[-]notch services for years, and still hasn't made the progress.

*Id.* at 39.

Next, the CYF caseworker, Stacy Policicchio, testified to working with Mother since 2017. *Id.* at 41. Ms. Policicchio confirmed that Mother participated in recommended services. *Id.* at 46-48. Like Dr. Bliss, she relayed that Mother "had not progressed, and [CYF] continue[s] to see the same pattern of behavior across a number of years in this case, and that behavior is related to [Mother's] inability or unwillingness to protect her children." *Id.* at 54. Ms. Policicchio testified that "in March of 2023, [M]other was found to have moderate compliance but minimal progress." *Id.* at 55.

Mother's "primary counselor," Kayla Burris, testified to being a "dual diagnosis therapist." *Id.* at 63. Ms. Burris began working with Mother "in June/July 2021." *Id.* She stated that the "focus in therapy is problem-solving skills and maintenance" of Mother's "mental health[,] … as well as if she ever has concerns about her recovery from alcohol." *Id.* Ms. Burris testified that Mother had been sober for two years. *Id.* She further opined that Mother "made progress in her treatment." *Id.* at 65. She stated that Mother "made progress in implementing what she's learning in her day-to-day life." *Id.* at 68-69.

Another therapist, Amanda Buchheit, testified to counseling Mother about intimate partner violence (IPV). *Id.* at 72. Ms. Buchheit began counseling Mother in October 2022. *Id.* According to Ms. Buchheit, Mother progressed in treatment. *Id.* at 74. Notably, Ms. Buchheit conceded she "can only go [] on, … what [Mother] tells me as my client." *Id.* at 75.

Hillary Repasi testified to being a "family support partner" and helping Mother search for employment and housing. *Id.* at 81. At the time of the hearing, Mother had a job but had not secured stable housing. *Id.* at 82-83. Ms. Repasi stated that she would meet with Mother weekly, usually during Mother's visits with Child. *Id.* at 84. Ms. Repasi opined that Mother had progressed with "self-confidence and being able to do things on her own." *Id.* at 85.

Finally, Mother testified in opposition to termination and recounted her participation in various services. *Id.* at 88-90. Mother said she had a "safety

plan" to deal with domestic violence and places to go if she felt threatened. *Id.* at 90-92. Mother stated that she had support from friends, neighbors, and community resources. *Id.* at 105. She added:

> If I decided to get into [a] relationship, I would definitely take my time. There wouldn't be … anybody at my house or [any]thing like that. But … right now, I'm focusing on me.

*Id.* at 106-07.

Mother further testified that she was a different person from who she was when Child was removed from her care. *Id.* at 106. Mother stated that she has more confidence. *Id.* at 107. She explained:

> I learned how to control my anger. The alcoholism is a big [] thing that I've been able to work through. Even when I had moments where I had the urges, I've been able to talk to my therapists and stuff to work through all of that. Even when my therapist [is]n't available, I have friends that … I can communicate with that … walk me through everything.

*Id.* at 106.

After hearing the evidence, the orphans' court found Mother remained incapable of providing for Child's essential care and could not or would not sufficiently remedy the causes of her incapacity. *In re A.H.*, 247 A.3d at 443 (citing Section 2511(a)(2)). The orphans' court explained:

> Much like with her previous children, Mother has struggled to address her own issues and to make necessary changes to her functioning. The court recognizes that Mother's life has been marred by extremely unfortunate and traumatic events. … Mother has hopped from relationship to relationship, often not knowing a great deal about these men. There has been some form of domestic violence in nearly every one of these relationships. Unfortunately for Mother, her relationship w[ith Child's] father has been equally as dysfunctional and dangerous as many of her past relationships. Mother's mental health has

- 11 -

also been a long-standing concern for the court as it has always played a significant role in her poor decision-making and impulsiveness. As such, it was vital for Mother to consistently engage in both mental health and domestic violence treatment to address these concerns. These were the primary goals that the court considered when determining whether Mother's conduct warranted termination pursuant to 23 Pa.C.S. § 2511(a).

Mother's most important goal was to address the domestic violence issues that have continued to plague her romantic relationships. Mother was expected to engage in domestic violence counseling in the hopes that she would be able to utilize this counseling in her day-to-day life and make better decisions. The court was hopeful that Mother would be able to develop the insight necessary to recognize potentially unsafe paramours. The ultimate goal was for Mother to make informed decisions about the individuals [to whom] she exposed herself and her children. **To her credit, Mother has consistently attended domestic violence counseling and even incorporated it into her mental health treatment plan. Sadly though, she has not made any progress in utilizing the skills she has learned in counseling**. Despite understanding how dangerous it is to begin relationships with men she barely knows, Mother has continued this practice for several years. When these relationships turn violent, Mother often does not report incidents of violence to law enforcement. Mother remained in a relationship with [Child's] father despite an incident where he nearly strangled her to death. While she did seek a Protection From Abuse order (hereinafter "PFA") after this incident, Mother admitted to having contact with him after a final PFA order was entered. Mother reported that this contact was singular and only to retrieve a vehicle she claimed he had stolen from her. However, Father was found partially clothed in Mother's bedroom during an unannounced visit by the []CYF caseworker in September of 2023. Mother has been dishonest about the nature of her relationship with [Child's f]ather[,] as well as the level of contact she has with him. It is disturbing to this court that Mother would allow an individual into her home after he violently attacked her. **The September 2023 incident is particularly reflective of Mother's inability to implement anything from the roughly two years of domestic violence counseling that she has attended. The court finds Mother has not satisfactorily completed this goal and is unlikely to do so in a reasonable amount of time**.

- 12 -

Mother's mental health has always been a concern because of her past trauma and poor decision-making. Mother has several serious mental health disorders which have affected her ability to parent her children. Specifically, the court has significant concerns about Mother's Post Traumatic Stress Disorder and Personality Disorder diagnoses. Both disorders are pervasive in nature and require a long-term commitment to intensive mental health treatment. For these reasons, **it was extremely important that Mother not only attend treatment but implement the skills and practices she was learning**. While Mother's day-to-day functioning seemed to improve slightly, her overall mental health remained a significant concern throughout the life of the case. **Despite significant compliance with her mental health treatment, Mother has yet again[] been unable to make the progress necessary to create a safe and nurturing home environment for [C]hild**. The court finds that Mother has been unable to satisfactorily complete her goal of addressing her mental health issues and will be unable to do so within a reasonable period of time.

OCO at 10-12 (emphasis added).

The evidence supports the orphans' court's conclusion that, "[w]hile Mother's overall functioning has improved, she still lacks the … capacity … to keep [Child] safe," and "has been unable to remedy the conditions which brought [Child] into care." *Id.* at 12. The orphans' court did not err or abuse its discretion in terminating Mother's parental rights under Section 2511(a)(2).

2. *Section 2511(b) Needs and Welfare*

In her second issue, Mother argues the orphans' court abused its discretion by finding that termination meets Child's needs and welfare. Mother's Brief a 26.

The Adoption Act states:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. ...

23 Pa.C.S. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However,

the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. Importantly, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship.

*In re A.H.*, 247 A.3d at 444–45.

Mother references Dr. Bliss's testimony about Child's "strong and positive attachment" to Mother. Mother's Brief at 27 (citing N.T., 10/20/23, at 23-25). Mother states:

Mother loves [Child] and has much to offer for her benefit. The relationship between Mother and [Child] adds value to their lives. Termination would unnecessarily and permanently deprive [Child] of her relationship with Mother, and it is not best for her needs and welfare. [Child] deserves to have her relationship with Mother preserved….

*Id.* at 28.

The record does not support Mother's argument. Based on interactional evaluations, Dr. Bliss concluded there was a bond between Child and Mother. N.T., 10/20/23, at 23. However, she also found that Child was bonded with Foster Parents. *Id.* at 24. Dr. Bliss explained:

> [Child] appeared to have strong, positive attachments to all three individuals. She did appear to be slightly more attached to [F]oster [P]arents. She … used a bit more, or attempted to use a bit more verbal words, essentially talking. She also engaged with them a bit more, made happy, nonverbal cues or sounds…. [D]uring the appointment with [M]other, [Child] pointed at the door several times[,] to the waiting room where [F]oster [P]arent was, but she was still content enough to stay with [M]other despite pointing at the door. So there was absolutely an attachment and bond with [M]other, but it did appear to be slightly stronger or more secured with [F]oster [P]arents.

*Id.* at 24-25.

Dr. Bliss also addressed the effect of severing Child's bond with Mother, stating:

> It is my opinion that [Child's] relationship with [F]oster [P]arents and that secure attachment could mediate any of those potential concerns or problems. But, naturally, severing any bond or attachment that a child has can impact them.

*Id.* at 25.

Notably, the Pennsylvania Supreme Court recently "emphasize[d that the] analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *K.T.*, 296 A.3d at 1113. The High Court explained:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and federal law [the Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the

- 15 -

court's analysis of the child's welfare and all her developmental, physical, and emotional needs. *See T.S.M.*, 71 A.3d at 268–69 ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved."). Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

*Id.* (footnotes omitted).

In this case, Mother has never cared for Child. Child has resided with Foster Parents, who are a pre-adoptive resource, since Child's birth in 2021. N.T., 10/20/23, at 53. Ms. Policicchio testified that Foster Parents meet all of Child's needs. *Id.* Similarly to Dr. Bliss, Ms. Policicchio testified:

[Child] seems very comfortable in her foster home. She smiles frequently, she will play with foster mom and with her foster brother, she seems to go to foster mom pretty easily to get her needs met, like if she needs something or needs help with something. [T]hey definitely seem to have a strong bond and a positive relationship.

*Id.* at 52.

Consistent with the evidence and law, the orphans' court "considered the testimony and reports of Dr. Bliss in determining the nature of [Child's] bond" with Mother. OCO at 12. The orphans' court observed:

… [C]hild does share a secure attachment to Mother. The court also notes that [C]hild shares a secure attachment with [F]oster [P]arents. **[Child] looks to [Foster Parents] to meet her daily physical needs as well as her psychological and emotional needs**. The []CYF caseworker, Stacey Policicchio, testified that [Child] appears "very comfortable" in the foster home and … has a strong and positive relationship with [F]oster [P]arents. It is the belief of this court that [F]oster [P]arents would be able to address any adverse impact caused by the termination of the relationship between [C]hild and Mother. For

- 16 -

these reasons, the court found that the bond between [Child] and [] Mother was not necessary and beneficial, and that the cessation of the relationship would not cause extreme emotional consequences.

In cases where domestic violence is a concern, the court heavily weighs the child's need for safety and stability. This consideration is largely based upon the court's familiarity with the long-lasting effects of domestic violence on children. Not only is domestic violence a concern for a child's physical wellbeing; it can also cause significant psychological problems. … For those reasons, the court f[ound] that termination of Mother's parental rights would best suit the safety needs of [C]hild. After considering the nature of the bond of [Child] with [M]other and [F]oster [P]arents, and [Child's] safety and stability needs, this court found that termination would best suit the needs and welfare of [C]hild.

*Id.* at 13-14 (emphasis added, citation omitted).

The orphans' court concluded that Child "deserves permanency[,] and termination of Mother's parental rights is in [C]hild's best interests." *Id.* at 14. The orphans' court did not err or abuse its discretion in considering Child's needs and welfare under Section 2511(b). Accordingly, we affirm the order terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 5/21/2024

- 17 -